of David Madison Cawthorn v. Auto-Owners Insurance. They must not have known how exciting your presentation is going to be. I tend to clear the room a lot, Your Honor. Good afternoon. Good afternoon. Steve Marino on behalf of Mr. Cawthorn. This case does not involve a boat. I'm sorry. No, I'm not. It tangentially involves an RV. But what it really involves is a terrible auto accident that occurred on April 3rd, 2014. It's going to be a parent's nightmare, really. It is, absolutely. And the tragedy, of course, is that it's during the daytime. There's nothing untoward involved. It's just two young men who are lifelong friends driving home, and one falls asleep while driving. I want to read to the Court an email. Mick, yes, I read the letter. Nothing in the letter says that I may negotiate the amount of the consent judgment. The letter only addresses the propriety of entering into an agreement in light of the exhaustion of the policy limits. I will work with you and Bradley on the other terms of the agreement, but cannot participate in negotiations as to the amount of the consent judgment. There is a judgment entered in state court against Bradley Ledford and in favor of David Madison Cawthorn. That is a judgment in the courts of this state. That serves as the predicate for the action that was brought under an assignment agreement by Mr. Cawthorn against auto owners. That case proceeded up through pretrial conference. At the pretrial conference, judge advised us that his apologies, he had not quite caught up on the case yet, and that pretrial conference became a two-plus-hour impromptu summary judgment hearing. After the hearing, the Court asked for additional briefing on this relatively novel issue of the judgment that we've been proceeding under all this time was an evidence of an excess judgment against the insured, and it can't be anything else. There is an exhaustion of policy limits, and then there's a $30 million judgment entered against their insured, per agreement. Now, the Court struggled with the idea. Against their insured, you said? Correct. Right. So Bob Ledford's RV has a $1 million primary and $2 million excess. Bob Ledford's… The auto owner is foreign to all this at this point. No. Didn't participate in the settlement agreement. Weren't required to, as I read the record. Those are two different things, Your Honor. So here's what happens. Case is presented, the claim is presented to auto owners. They have an opportunity to settle. They don't settle by the time suit gets filed. When suit gets filed, Mr. Ledford calls auto owner's adjuster and says, What's going on? I just got sued. It's July 14, 2014. It's three months post loss. This young man is paralyzed. He's lost a kidney. He's had broken bones, burns. You told me you were going to settle this case. What's going on? At that point, the adjuster, per the record, says, Oh my gosh, how'd this happen? I'm following all this on Facebook. I don't know how this happened. Oh my gosh. Weeks go by. That's all your good faith. That's not at issue before us today. Okay. So what happens is the case goes in litigation. Two years of litigation goes by in which auto owners participates on behalf of their insured defending Bob Ledford with one attorney and Bradford Ledford with another attorney. May of 2016, they go to mediation with Ms. McLean, the adjuster, who's handling this case the whole time. And at that point, the conversation becomes, Look, $3 million is not going to be enough anymore. Let's arrive at an agreement that Florida law supports that says, We'll settle with one insured and then we'll do a consent judgment against the other and then we'll bring the case against the insurance company. It doesn't resolve there. Over the next series of months, the parties all communicate and auto owners are brought into it. Personal counsel, Mr. Callahan and Mr. Obrant for Bob's RV, they are writing letters to auto owners saying, Please participate. Please give us permission. Please negotiate yourself for your insured to make this arrangement. Ultimately, this is September 3, 2016 letter. How would auto owners have anything to do with that? The deal between your clients and Ledford? They had no skin in that game. They were in it for $3 million. I don't understand if you're making a statement or a question. The insured and the insurance company are in privity with each other while this defense is going on. The insured's personal counsel for both of the insureds is repeatedly communicating with the insurance company saying, We want to resolve this to protect the insured. Please do this. The two appointed defense counsel, Ms. Moses, is appointed by auto owners to defend Bradley Ledford and she's writing to the adjuster saying, We should do this. We should protect the insured. It's in his interest to do so. And that leads to a September 3, 2016 letter in which they say, Okay, we'll pay the $3 million the way you want, but if you want to do the excess judgment, that's up to you and your personal counsel and appointed defense counsel. And not one person on behalf of auto owners testified that that letter meant anything other than, and I quote, We told him it's up to him and his attorneys to decide what to do in that regard. Quote, What we were telling him is that, you know, if you think it's in your client's best interest and a way to protect him, it's up to you guys. That's what auto owners said. This isn't a case, like you see some of the citations, where behind the insurance company's back, they secretly negotiate a deal. This is a case where over and over again over the course of months, personal counsel and appointed defense counsel reached out and encouraged the insurance company to participate. And the insurance company's ultimate response was, We'll go along with what you're saying. It's up to you about the consent judgment. A condition of the agreement, and it's a mistake in the record in terms of the answer brief. October 20th, the agreement is executed. October 26th, as a condition to that judgment, to that agreement rather, auto owners pays its $3 million to get Bob's RV out, and then as a subsequent condition, the judgment is entered. So it's specifically in that agreement, which is in the record. It says payment by auto owners of the $3 million for Bob's RV is a condition to this agreement. So not only was auto owners aware of it, and Mr. Froman, their corporate representative, confirmed in his deposition that they were aware of it. Subsequent to the execution of it, auto owners ratifies it by making payment in accordance with the agreement and then standing by while the appointed defense counsel goes to court and enters the judgment. This did not come up in the case as an affirmative defense. Wait a second, this is not a valid judgment. This doesn't form the basis. This did not come up until the argument at the pretrial conference. So the court concluded, as a way of disposing of the case, the court concluded that there is no evidence of an excess judgment against this insured, which facially is not accurate. There is a judgment entered on December 20th, 2016, against their insured, Mr. Ledford, in the amount of $30 million. It doesn't get much more excess than that. What is the evidence in the record of damages other than the $30 million agreement? Oh, there's a bunch. They litigated this case for two years. The court references, I believe, in its order, that there's a testimony, and we certainly cite in our brief, that it was testimony by the plaintiff's expert on valuations that his economic damages alone would have been $24 million. Yeah, but what I'm looking at is the time frame from the date of the accident on April 3rd until auto owners paid the policy limits on August 7th. Have I got my dates right? Kind of, sort of. The accident happens on April 3rd of 2014. Which I think is what I said. Right, by April 17, internally, and to their insured, Mr. Ledford, the senior, they admit that Ledford RV, their insured's 100% liable. Over the course of the next weeks, and by their own admission, by May 27, they recognize that the damages are going to exceed the available coverage. They are aware, through information they have in front of them, through information they're getting from their insured, that Mr. Cawthorn is paralyzed. He lost a kidney. He has fractured ribs, other fractured bones, burns, terrible injuries. They recognize, and by May 27, the adjuster tells Mr. Ledford, senior, and his girlfriend, we're going to take care of this. We're going to tend to the policy limits. That doesn't happen. There is no explanation given for why, through May, through June, they fall into this situation. I mean, one thing is she keeps writing saying, I need the medical records. May 7th. She writes and says, I need medical records, but you don't actually need medical records to determine that the injuries are so severe that they're going to exceed your policy limits. There was no question, there was testimony about the agent as early as April 8th saying, your policy limits are spent. This is far in excess of your policy limits. A young man at age 18, being paralyzed and a ways down for the rest of his life and not having a shortened lifespan, you don't need a medical record to tell you that that's going to exceed the policy limits. And ultimately, they didn't get policy limits. Well, sorry. Ultimately, they didn't get medical records. They got a lien statement for 300 and some odd thousand dollars. But here's the series of events. July 14th, Mr. Ledford, senior, and his girlfriend call the adjuster and say, I just got sued. What are you doing? July 31st, this document comes in the mail that says there's a lien from one hospital for $386,000. August 5th, and this was absent from the court's recitation of facts, August 5th, personal counsel, Mr. Obrant, calls the adjuster and says, or writes the adjuster and says, you told you... Everybody knew from day one that this accident was going to go over $3 million. I agree with you. Right, and everybody knew from day one that there was no excess carrier here. Well, there was. There was a million primary and 2 million excess. But there was no coverage beyond the 3 million. No coverage beyond the 3 million. What is it, your theory, that auto owners did that made them liable for the excess? They failed to settle when they could and should have done so, which is a question of fact... What, for 3 million bucks? Absolutely. People were all lawyered up in this case. That's not true, your honor. The record doesn't support that. For this accident. The record doesn't support that. In fact, the order that we hear about doesn't support that. It says that on June 11, 2014, Mr. Ledford Sr. called the adjuster. Are you suggesting to us that had they put on the table the $3 million earlier, this case would have gone away? That is the undisputed testimony. Well, that is just preposterous. Judge, I don't understand how I can respond to that if that's the testimony from the father and the son and that's the only testimony in the case. I overstated that. But it just does not seem that this case would have gone away for $3 million. That is a question for the jury. If you believe that, that's fine. But that's a question for the jury. Fair enough. But the undisputed facts in this case are that on June 11, 2014, Mr. Ledford Sr. called the adjuster and said, What's going on? I need to settle. What are we doing with this? And she admits, Ms. McClain admits, that she did not offer him money. He felt he got the runaround. He was told repeatedly by his testimony, and this is in the order, the court in the order cites this testimony, that he was told several times, Don't hire a lawyer. If you get this judgment entered or get it reentered. Yes, sir. We go back to a jury and the jury gets to decide. Then you try good faith, bad faith. That's correct, Your Honor. And is it your position that this liquidates damages? Yes, Your Honor. That's what the purpose of this is. On one of two prongs. How does, when does auto owners get to prove that it was unreasonably high and collusive? Well, they didn't actually plead that, and actually in the hearing that led to this order, the judge asked them point blank. He said, Well, you're not contesting the amount, are you? And one lawyer said yes, and one lawyer said no, and it was a little confusing. But yes, they have the opportunity. They never hire an expert on this. They never put any testimony in saying it wasn't reasonable. When were they supposed to put it in? Because the way the law in Florida works is the proponent of the judgment has the initial burden of making a prima facie showing that it was reasonable and made in good faith. This is below, before. Gentone. Okay. But he never got to that step. He didn't. He didn't look at the, but at the hearing, it was obvious from the pleadings that they weren't really contesting the reasonableness of the judgment. Their own lawyers had evaluated it as being an eight-figure case as high as $30 or $40 or $50 million. This was a tragic case. They did not hire an expert or have any other testimony in the record. You can't reach that. No, but you're asking me during the case. You're saying in the run-up to the hearing, to the summary judgment and so forth. In the run-up to trial, because this was the pretrial conference. We were supposed to try the case the next week. Discovery was closed. They had never disclosed an expert as to the amount being unreasonable or not made in good faith. And that's how the burden shifting works in Florida. The proponent has to make a prima facie showing it was reasonable and made in good faith, usually through an expert, and we have an expert. We designated one to testify to that effect, and he did. And then the burden shifts to the insurance company or the opponent of the judgment to prove by the preponderance of the evidence that it was either not reasonable or not made in good faith. And they had no expert designated to talk about those issues. Just before you go to sit down, I just want to know, how are you going to... What's your proof that this case would have settled for $3 million? The testimony of Mr. Cawthorn Sr. and Mr. Cawthorn, the younger. They both testified that up to June 11th when his father was calling saying, can you please settle with us? Can you give us the insurance proceeds? They would have settled the case, but for the adjuster telling them, giving them the runaround about the amount, not agreeing, not saying, I can pay you $3 million, and don't get lawyers. Lawyers are going to take a bunch of it. Don't get lawyers. That put them in a mood to get a lawyer and say, we don't trust you anymore, we're not confident, and we'll file a lawsuit. Thank you, Your Honor. Mr. Villeneuve? May it please the court, Peter Villeneuve on behalf of Auto Owners Insurance Company. There are only three ways a third party can make a bad faith claim. The court recognized this in an exhaustive discussion, in a 26-page opinion. The reality is that you can't make a Powell claim without an excess judgment. A Powell claim presupposes an excess judgment. And the only way to get an excess judgment, there are three ways under the Supreme Court law of the state of Florida in Pereira. You can have either the classic case, which is a verdict in excess of available insurance limits, which we know didn't happen here. Or you can have a Koblenz agreement, which they admit didn't happen here. Or you can have a Cunningham agreement, which obviously didn't happen here. What happened here was that there were two insureds. One insured was a corporate entity, allegedly, presumably with deeper pockets, and one was a 17-year-old boy who was a permitted driver under a policy. The 17-year-old requested that the insurance company pay all of the proceeds available to the corporate entity in exchange for a release. And they did so. They then, because they had not only a duty to defend, but a right to defend, and they had to defend their insured, they said, we will also continue your defense without reservation. They did everything they were supposed to do to protect their insureds. Judge Antone reflected in his order that now what appellant is trying to do is turn a rejection into an acceptance. And they just can't. And I think if you look at Judge Antone's opinion, on page 22 to 23, it says, a settlement between the insured and the third-party plaintiff forecloses a determination of whether the insured would be exposed to liability for damages in excess of the policy, as contemplated by the policy and Florida law. And that's the point. It goes on. Allowing such agreements without the insurer's authorization to provide a basis for bad faith would remove the safeguards promoted by Florida courts. How does it do that? He still has to prove his bad faith claim. No, Your Honor. You can't get to a bad faith claim unless you have something that the insurer did to cause the damage. And in this case, there's no excess judgment. The only way to make a bad faith claim is to have an excess judgment, which is defined as either a coblance agreement, excuse me, an excess judgment or a functional equivalent thereof. Why isn't this a functional equivalent? Because it doesn't fall under the criteria for the Florida Supreme Court, Your Honor. You need either a verdict in excess of the limits, which we don't have here, or you need a coblance agreement, which they admit we don't have here, or you need a Cunningham agreement, which is something that the insurer agrees. In this case, it was the exact opposite. A Cunningham agreement was sent to auto owners. It had their signature line. Auto owners refused to sign that agreement, saying instead, if you are asking us to pay all of the insurance limits on behalf of the corporate entity, we will do so. We will also continue your defense without reservation. They did not sign the agreement, and they would not sign the agreement, and the ultimate agreement that they entered, two best friends driving in a car home from spring break for $30 million without any verdict and no basis for the insurance company to cause that, that agreement didn't even contain auto owner's signature. It's not even like it was there with an X through it. It was removed. Why was it removed? As Your Honor pointed out in questioning, it was removed because they did not agree. This court has said that several things. One, in Zurich, there is absolutely, and for that matter, the floor of Supreme Court in Burgess, there is absolutely nothing that requires the insurance company to agree to be liable for amounts in excess of their available coverage. You haven't, that's fine, but you haven't agreed to that. You haven't agreed to anything in terms of amount. Your Honor, there's no excess judgment to which to agree. The only way to get an excess, there are only three ways to get a bad faith claim, and that is what Pereira stands for, and that is what Judge Antone found, that you need a classic excess judgment, which is a verdict in excess of available limits, or you need a Koblenz agreement or Cunningham agreement. They don't meet the threshold to bring a bad faith claim, which is why I suggest they have refiled in Volusia County a case, Cawthorn v. Bradley Ledford, the person with whom there's already an existing consent judgment, I believe conceding the propriety of Judge Antone's order that they just have no excess judgment here on which they can proceed to a bad faith claim. Wouldn't you agree that it makes a good deal of practical sense to, you know, where you have a judgment here that's . . . we have an amount of loss that's catastrophic, that everyone will agree is way into eight figures. They settle that up, and then you try bad faith. This will save you . . . Won't this save all . . . your client as well as your opponent's client lots of unnecessary time? Your Honor, I think there are several parts to your question. I want to address them all. We need to look at the facts of this case. The facts of this case would not even come close to that situation that you're suggesting for several reasons. One, retained counsel in this case brought in a third party, the barrier company that was referenced earlier. That barrier company was liable and paid a multimillion-dollar settlement in exchange for a release. I don't know who would have been at fault. Retained counsel in this case testified that they were always discussing what percentage would allocate fault. In fact, he had raised in the underlying action a defense of joint adventurer that survived motions that he was going to present to a jury where he thought there was a possibility of an actual defense verdict, at least as to his clients. So we have no number. We may say that . . . You may believe that this was . . . You may believe it was an excess claim of excess of three million, but without an excess verdict, we have no claim for bad faith. That's the whole point of Florida's protections. Otherwise, two best friends could enter into a consent judgment any time they thought there weren't sufficient proceeds and then just take a swing at the insurance carrier to pay the rest. In this case, we had a barrier company with tens of millions of dollars of insurance. But that never went to trial. Nothing went to trial. There was no verdict, even though there was a complete defense that was offered without reservation of rights. And the insurance company has an absolute right to a determination unless there is a Koblentz agreement or they agree through a Cunningham agreement. Your position is that these three avenues are the exclusive way of testing them. There are no hybrids. There's no fourth or fifth way. In Florida law, they're just those three. We all know, Your Honor, that on footnote 7 of the Pereira opinion that Judge Anton relies on so heavily, it says, I don't forestall other possibilities. But Judge Anton considered that and said, I recognize the footnote, but this is certainly not the possibility that we're talking about. And that goes into the privity argument. And the chief judge of the Northern District of Florida recently said with regard to the privity argument that the fallacy of the privity argument is readily apparent. Because if you follow the privity argument, it says if the insurer refuses to defend, then they can be liable under a Koblentz agreement because the insured is left to their own devices. But if the insurer does defend, then they're liable under a privity argument, which means there's never a need for a Cunningham argument because you never need the insurance company to agree. It's fallacious. It doesn't work. You cannot box the insurance company into a position where at any time two best friends, any claimant and any insured, can enter into an excess consent judgment and deem the insurance company liable for that amount. You don't meet the threshold of bad faith in the absence of an excess judgment or the functional equivalent thereof. We know there's no Cunningham agreement. We know there's no Koblentz agreement. Everybody's admitted that. So what we have is no verdict in excess of available insurance limits, and that is what USAA Jennings says you need in order to get a classic bad faith claim of an excess judgment. I have one more point, if the court has no further questions on that regard. We all know that this court can affirm on the grounds Judge Antone raised so eloquently in his order or on any other ground. And I would just put forth to this court that in his opinion, Judge Antone sets forth all the facts necessary to find that there was no bad faith in this case. What we have in this case, and this court in Aboy, in FIJO, has said multiple times that an insurance company has an absolute right to investigate, and as Judge Martin pointed out earlier, an absolute right to see credible third party documentation during their investigation before making an actual decision on value. In this case, I agree, the injuries were severe, but the question was, do we know? And when the adjuster went to the person in staff legal, the question came back was, is this paralysis even permanent? What do the records say? Immediately upon receipt of the police report in this case, the day it was received, which was the first time that auto owners knew of the address of the injured party, the day they learned of the address, they sent to that address an authorization for release of medical records. The very day. That was April 29th? It was April 17th. Okay, thank you. It was the day the police report arrived. What happened was, thank you, on April 29th, the father returned that authorization, and it was signed David Cawthorn, and it was circled parent. And so in their duty, immediately the insurer turned that into the hospital and said, medical records, please. And the hospital, in fact, it was even better. They served a handwritten fax note with the authorization saying, please get me these as soon as you can. We really want to get this gentleman some help, and we need the records in order to do so. They then said, if there is a cost, please tell me in advance and I will bring a check. I will pick the records up personally. And Pamela McLean, the representative from auto owners, stated that she was going to drive the hour and a half to pick up the records. Mr. Marino said that had the policy been put on the table earlier, the Cawthorns would have accepted the $3 million. And that opportunity was lost because of this, that, and the other. I heard him, Your Honor, yes. Did he speak the truth? I don't mean to be flippant. I know that in this case, the father said, well, had they offered it, we'd have taken it, but they never offered it. But if you look at the email exchange, what they specifically said was, first of all, you look at the testimony in that regard, and Pamela McLean said, I was so thankful having left my cell phone number with them previously that finally I got a call from Mr. Cawthorn. And I discussed with him the need, because of the rejection of the original authorization, because the hospital said, I can't give you the records. Mr. Cawthorn's now 18. Is what? 18. So what happened was, it came back, and the email exchange that followed was, thank you, it was a pleasure talking to you. She testified that as soon as they had that conversation, she was so excited she was going to get a release, an authorization for release of records. She wrote back, here's another copy of the letter. I am looking forward to the release so I can move forward. He writes back and says, I've read your letter. It says, settle the insurance portion of this. What does that mean? She writes back and says, we would write a check to Mr. Cawthorn in exchange for release of our insureds to spend as you deem fit. And he writes back, how much was the check before? She responds, there's $3 million in coverage. The next thing you know, a lien notice comes from Optum. No number on the lien notice, just says, we're here. She's never received a medical release. She writes back immediately and says, can we please have a copy of the medical release? I'd like to get that soon. She didn't know they'd already sued. And that was the problem, Your Honor. This court allows the duty, there's a duty to investigate. This court allows an investigation. And this court has said that you need credible third-party documentation and you have a right to it. Was the good faith issue, was the briefing on the good faith issue before the district court closed? In other words, both parties had the opportunity to put in, to make a complete summary judgment presentation on good faith. Yeah, Your Honor, I believe that Judge Antone heard good faith testimony. But the question of whether this was raised for the first time in an oral argument is preposterous. For Pereira. Was it briefed? It was briefed. In our brief, Pereira was in our brief. There was never a bad faith claim here at all. We believe that there was no bad faith in general. But there's no threshold to get to bad faith. Because auto owners never had an opportunity to get an excess judgment. And Florida law is clear that you can't have an excess judgment unless it's the insurance company's actions, not the insured, the insurance company's actions that caused the damages. In this case, as Your Honor pointed out, it was the two best friends and their counsel that decided on the consent judgment. Auto owners took no part in it. And under Florida and federal law, had no duty to take part in it. And there's absolutely no obligation for them to enter into an agreement to pay more than their contractual policy limits. I see that I'm over my time. Thank you. Thank you. Thank you very much. I'm going to stick to the record. Most of that conversation about the third party and the barrier company, that's not part of the record. It wasn't part of the record up on here on appeal. What we're talking about here is there's a lot of reliance on Pereira. Footnote 7 says, we do not intend to limit the types of bad faith claims that may be brought in other cases to only the case law discussed in this opinion. We discuss the case law only to determine whether the principles from prior bad faith case law may be relevant to the facts in this case. And Pereira specifically says in two different places, we're looking at very specific facts for this issue, which was the interplay between a series of carriers, two of which settled, one didn't, but there was an excess policy way beyond the settlement amount. Pereira was limited to its own terms, and it says in footnote 7, we're not foreclosing other opportunities. This court recently in Brannon v. Geico addressed one of those opportunities. 17 days. 17 days from the date of loss to the date of tender, and the court says it's a question of fact, go back to the trier of fact, and see whether there was a failure to settle when they could and should have done so. That is the standard, whether the insurance company, given the totality of the circumstances, fails to settle when it could and should have done so. And in Brannon, one of those hybrids you talked about, Judge Parker, was an issue, because what happens these days, as I explained to the court, is what happens is the carriers say, okay, I agree with Judge Parker's theory that as Cunningham said, as the Supreme Court said in Cunningham a long time ago, it doesn't make sense to spend all the time and money trying a case when you know the real issue is the bad faith. And insurance companies, claimants very rarely agree to the idea of let's try the bad faith case first and then go try the tort case. So what they do is, and what happened in Brannon and other cases that have been before this court, they allow the insured and the third party to enter into a settlement agreement, they waive any policy defenses and say, we'll use that to quantify, now we'll go try the bad faith case. And not once in this case ever did auto owners say, wait a second, you're violating the policy. Wait a second, you're breaching your contract to us by entering this agreement. Wait a second, you're voiding the coverage. They've never said that. They've never complied with any of the statutory requirements that say if you are violating the voluntary payments, lack of cooperations, assumption liability clauses, we have an obligation to timely tell you. And more importantly, in Mid-Continent versus American Pride, this court held not only does an insurance company have an obligation to tell you, they have an affirmative duty to get you to cooperate. Here, the opposite happened. The record is clear. They were asked by everyone involved, including their own appointed defense counsel, can we please do this? And the best answer they got was, we'll go along with it. You deal with the judgment. It's up to you if you want to do the judgment. And we'll go ahead and after that agreement's entered, we will ratify it by paying the conditional $3 million under the agreement, and then we'll stand by silently while you go out and you get a $30 million excess judgment. You cannot define the existing judgment under Florida law as anything other than a judgment in excess of the available coverage. Thank you. Thank you. All right, that concludes our cases for the day. Court will be in recess until tomorrow morning at 9 o'clock.